**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANGELINEL BROWN,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-421-KSM** |
| **CITY OF PHILADELPHIA, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                           **May 27, 2021**

Plaintiff Angelinel Brown filed this action against Defendants the City of Philadelphia and Jewell Williams, the former Sheriff of the City of Philadelphia, (collectively, "Defendants"), alleging that Defendants retaliated against her for failing to support Williams during his re-election campaign and for remarks she made about Williams's proposed use of Sheriff's Office funds.[1]  (Doc. No. 22.)  In her complaint, Brown asserts claims for political patronage retaliation and free speech retaliation under 42 U.S.C. § 1983, contending that Defendants violated her rights under the Free Speech and Free Association Clauses of the First Amendment.  (*Id.*)

Defendants have moved for summary judgment.  (Doc. No. 36.)  First, Defendants argue that summary judgment is warranted on Brown's free speech retaliation claim because all of Brown's statements fell within the ambit of her ordinary job duties and therefore did not constitute protected speech, none of the instances involved a matter of public concern, and Brown has provided no evidence that her speech was a substantial or motivating factor in any of

---

[1] Brown sued Williams in his individual and official capacities, but Brown concedes that her claims against Williams in his official capacity are duplicative and may be dismissed.  (*See* Doc. No. 29 at p. 1.)

the alleged adverse actions taken against her.  (*Id.* at pp. 13–25.)  Second, Defendants assert that Brown's political patronage claim fails for similar reasons (i.e., Brown's conduct was not protected, nor was it a substantial or motivating factor in any employment decisions made concerning Brown).  (*Id.* at pp. 25–26.)  Third, Defendants contend that summary judgment is proper as to Brown's *Monell* claim against the City because a municipality cannot be held liable on a theory of *respondeat superior* and Brown fails to establish an underlying constitutional violation, as required for a § 1983 claim.  (*Id.* at pp. 26–29.)

Brown untimely responded (*see* Doc. Nos. 38–41), and Defendants moved to strike the untimely filings and requested monetary sanctions (Doc. No. 42).  This Court granted in part Defendants' motion to strike,[2] and denied Defendants' request for monetary sanctions.  (*See* Doc. Nos. 48 & 51.)  The Court explains its reasons for granting Defendants' motion to strike below.

In addition, for the reasons discussed below, we grant in part and deny in part Defendants' motion for summary judgment.

## I.      Motion to Strike

### A.      *Procedural History*

Plaintiff filed this lawsuit on January 24, 2020[3] (*see* Doc. No. 1), and on April 29, 2020, this Court held a conference with the parties pursuant to Federal Rule of Civil Procedure 16 and issued a scheduling order (*see* Doc. No. 11).  Pursuant to the operative Scheduling Order, the parties were to complete discovery by October 30, 2020 and submit any motions for summary

---

[2] The Court struck Doc. No. 39, Doc. No. 40, and Doc. No. 41 pp. 1–12.  (*See* Doc. No. 51.)  However, the Court declined to strike Doc. No. 38, Doc. No. 41 at pp. 12–142, and Doc. No. 45.  (*Id.*)

[3] At the time of filing, this case was assigned to the Honorable Mark A. Kearney.  The following month, on February 28, 2020, the matter was reassigned to the Honorable Karen Spencer Marston for all further proceedings.  (Doc. No. 3.)

judgment by November 20, 2020, with responses due shortly thereafter, on December 11. (*Id.* at ¶¶ 4, 6.)

On November 13, 2020, Defendants requested an unopposed extension of time to file their summary judgment motions, which this Court granted. (*See* Doc. Nos. 32–33.) Accordingly, the Court ordered the parties to file any motions for summary judgment by December 4, 2020, with any responses due by December 28, 2020. (Doc. No. 33.)

On December 4, Defendants timely filed their motion for summary judgment. (*See* Doc. No. 36.) After the December 28 deadline for Brown to file a response to the motion passed without any filing or communication by Plaintiff's counsel, the Court entered an Order on January 8, 2021, in which it suspended all pending pretrial deadlines and informed the parties that it would issue a new scheduling order after ruling on the pending summary judgment motion. (Doc. No. 37.)

Nonetheless, on January 11, 2021—two days *after* the Court issued this Order and two weeks *after* Brown's response had been due—Brown's counsel began to piecemeal file documents in response to Defendants' summary judgment motion. (*See* Doc. Nos. 38–41.) These trickled in one by one: First, on January 11, Brown responded to Defendants' Statement of Undisputed Facts *only* (*see* Doc. No. 38) and then, two weeks later, on January 25—nearly *a month* after her response brief had been due—Brown finally filed an opposition to Defendants' summary judgment motion (*see* Doc. No. 39.)

That same day, Plaintiff's counsel appears to have attempted to file a counterstatement of undisputed facts (*see* Doc. No. 40 (text of docket entry)), but instead mistakenly filed a Second Amended Complaint in a matter that Plaintiff's counsel has pending in the Western District of Pennsylvania, involving an entirely different client and matter (*see* Doc. No. 40 (PDF filed)).

Plaintiff then filed her actual counterstatement of undisputed facts the following day, January 26. (*See* Doc. No. 41.)

Defendants then moved for the Court to strike Brown's untimely filings, or in the alternative, for an extension of time to file a reply brief. (Doc. No. 42.) Defendants also requested costs and reasonable fees for the expenses incurred in bringing the motion to strike. (*Id.*)

On April 23, 2021, the Court granted in part Defendants' motion to strike but denied the request for monetary sanctions. (See Doc. No. 48.) On May 5, 2021, the Court issued an amended order, clarifying that Doc. No. 39, Doc. No. 40, and Doc. No. 41 pp. 1–12 were stricken but Doc. No. 38, Doc. No. 41 at pp. 12–142, and Doc. No. 45 were not. (Doc. No. 51.)

### B.      *Legal Standard*

"It is beyond question that [a] District Court has the authority to strike filings that fail to comply with its local rules." *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 614 (3d Cir. 2018). "[M]atters of docket control . . . are committed to the sound discretion of the district court. [The Third Circuit] will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *Lue-Martin v. Mar. Grp. LLLP*, 379 F. App'x 190, 192 (3d Cir. 2010) (quoting *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982)); *see also United States v. Eleven Vehicles, Their Equip. & Assocs.*, 200 F.3d 203, 214 (3d Cir. 2000) ("[W]e have held that it is not an abuse of discretion for a district court to impose a harsh result . . . when a litigant fails to strictly comply with the terms of the local rule."). However, the Third Circuit has also held that "a district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied

on the local rule to his detriment." *Eleven Vehicles*, 200 F.3d at 214.

"By failing to file a response within the time specified by the local rule, the nonmoving party waives the right to respond to or to controvert the facts asserted in the summary judgment motion." *Buglak v. Wells Fargo Bank, N.A.*, Civil Action No. 16-4546, 2017 WL 3116137, at *2 (E.D. Pa. July 21, 2017) (quotation marks and citations omitted). Nonetheless, "a party's failure to file a timely response . . . by itself, does not require summary judgment" to be entered in the movant's favor. *Id.* (citations omitted). Even if a district court exercises its discretion to strike an untimely response to a summary judgment motion, the court must still "conduct a full analysis to determine whether granting summary judgment" is appropriate. *Weitzner*, 909 F.3d at 614. In other words, the "court must still determine whether the moving party's alleged facts warrant summary judgment." *Buglak*, 2017 WL 3116137, at *2.

### C. *Analysis*

In moving to strike Brown's untimely filings (response brief, statement of undisputed material facts, and answer to defendants' statement of material facts), Defendants (correctly) point out that Plaintiff's counsel *never* sought leave to file an untimely response, *never* asked for an extension, and filed the response brief *a full 28 days after the December 28 deadline* and a full 52 days after Defendants had filed their motion. (Doc. No. 42 at p. 6.)

In response, Plaintiff boldly asserts that "there exists sound rational [sic] for not enforcing a harsh sanction for a technical (and understandable) violation of the Scheduling Order." (Doc. No. 44 at p. 5.) Plaintiff cites to the following reasons for the delay: (1) Plaintiff's counsel's surprise in the fact that Defendants filed a summary judgment motion, since the parties had been engaged in settlement discussions; (2) Plaintiff's counsel fractured his elbow, which "interfered with his ability to run the basic functions of his office"; (3) the court

reporter did not provide Plaintiff's counsel with a copy of a deposition transcript until several weeks after Defendants filed their motion for summary judgment; and (4) the impact the pandemic has had on attorneys in general and on solo practitioners in particular. (*Id.* at pp. 5–6.)

While the Court sympathizes with Plaintiff's counsel as to his injury and the pressures the pandemic has placed on his practice, these are *not* valid excuses that permit him to blatantly ignore the Court's November 13, 2020 Order. Plaintiff's counsel could have—and should have—sought an extension from the Court,[4] yet he did not act until *after* the Court issued an Order suspending the Scheduling Order in this case, pending its ruling on the summary judgment motion.

Local Civil Rule 7.1(c) provides that "any party opposing [a] motion shall serve a brief in opposition . . . within fourteen (14) days after service of the motion and supporting brief." As such, this Court typically provides non-moving parties two weeks to respond to summary judgment motions, mirroring the local rule. However, in our April 29, 2020 Order, due to the Thanksgiving holiday, the Court provided the non-moving party with an additional week (21 days) to respond to any motions for summary judgment. (*See* Doc. No. 11 at ¶ 6 (directing the non-moving party to file within three weeks of any summary judgment motion being filed).) In granting Defendants' unopposed Motion for Extension of Time to File Motions for Summary Judgment and Responses Thereto (Doc. Nos. 32–33), the Court extended the deadlines by a

---

[4] This Court's Policies and Procedures clearly delineate the proper procedure for requesting an extension. *See* Judge Marston's Policies and Procedures, II.A.3 ("Parties are expected to adhere to all dates contained in the Scheduling Order unless there is a compelling reason to justify a change. Counsel should advise the Court immediately of any compelling reason justifying an extensive [sic] or continuance of any scheduled date. Such a request may be made by letter, describing in detail the basis for the request, noting the agreement or disagreement of all other counsel and setting for the period of delay requested . . . . **Any request for an extension or continuance must be made at least seven (7) days before the applicable deadline or include a showing of good cause as to why to party making the request could not comply with that requirement**." (emphasis added)).

commensurate amount of time due to the winter holidays, again giving the non-moving party three weeks (21 days) to respond to motions for summary judgment (*see* Doc. No. 33). As such, Brown was to file a response brief by December 28, 2020 in the event Defendants chose to file a summary judgment motion. (*Id.*)

But Brown did not remotely comply with the December 28 deadline. Plaintiff's counsel's behavior is particularly egregious because of the haphazard and troubling way in which the response brief and answer to Defendants' statement of undisputed facts were filed— two weeks apart, both well past the Court-ordered deadline, and without any acknowledgment of their tardiness.[5] Moreover, Plaintiff's counsel's assertion that he did not "deliberately disregard" this Court's order (*see* Doc. No. 44 at p. 2) is troubling to the Court because he *did* disregard this Court's November 13 Order when he filed a response brief *28 days after it was due.*

The Court concludes that, here, it is appropriate to exercise our discretion to strike Brown's untimely filings because Plaintiff's counsel has offered no sound justification for failing to comply with the deadlines set in our Order.[6] *See, e.g.*, *Lue-Martin*, 379 F. App'x at 193

---

[5] The Court also notes that this is not the first time Plaintiff's counsel has filed an untimely response to a motion, thus making the Court question the credibility of the excuses proffered as to this particular late filing, such as being taken by surprise and his injury. For example, Plaintiff's counsel filed Brown's response to Defendants' motions to dismiss late and only after being questioned by the Court as to whether he intended to respond.

Moreover, the Court notes that a settlement conference had been scheduled for November 19, 2020 but was cancelled the day before because Defendants did not believe a settlement conference would be fruitful after taking Plaintiff's deposition. At that time, Plaintiff's counsel certainly knew that settlement negotiations had ended, yet fails to be forthcoming with the Court in his response brief and cites to the fact that Defendants refused to offer anything at that time. Taken together, these facts undermine Plaintiff's counsel's current contention that he was "surprised" when a summary judgment motion was filed a little over two weeks later.

[6] The case law on which Plaintiff's counsel relies does not persuade us to hold otherwise. Indeed, none of the cases on which he relies involved motions to strike untimely responses to motions for summary judgment. *See Eleven Vehicles*, 200 F.3d at 214 (involving an untimely filed memorandum in opposition to a supplemental request for fees and expenses); *King v. M.R. Brown, Inc.*, 911 F. Supp. 161, 169 (E.D. Pa. 1995) (involving a motion to strike allegations from the plaintiff's Second Amended Complaint);

("[T]he District Court did not abuse its discretion when it struck Martin's untimely counter statement of facts."); *Buglak*, 2017 WL 3116137, at *2 ("Plaintiffs responded [to the defendant's summary judgment motion] seventeen days late. Due to their non-compliance with local rules, the Court will not consider Plaintiffs' response."); *Reynolds v. Rick's Mushroom Serv., Inc.*, 246 F. Supp. 2d 449, 453 (E.D. Pa. 2003) (refusing to consider the defendants' untimely response to the plaintiffs' summary judgment motion). Accordingly, the Court strikes Doc. No. 39, Doc. No. 40, and Doc. No. 41 pp. 1–12. (*See* Doc. No. 51.)

Defendants also request an assessment of costs and reasonable fees against Brown for expenses they incurred in filing their motion to strike. (Doc. No. 42 at pp. 7–9.) Brown did not respond to this aspect of Defendants' motion. (*See generally* Doc. No. 44.)

To support their request, Defendants cite to Federal Rule of Civil Procedure 16(f), which provides that "[o]n motion or on its own, the court may issue any just orders . . . if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). The Rule continues, "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2).

In seeking monetary sanctions under Rule 16(f), however, Defendants do not cite to a single analogous case (i.e., where the court granted a motion to strike an untimely summary judgment response and then granted monetary sanctions under Rule 16(f)). Moreover, the only

---

*Great W. Assur. Co. v. Levithan*, 834 F. Supp. 858, 864 (E.D. Pa. 1993) ("Here, the Plaintiff's Motion to Strike deals with striking various portions of Defendant's Answer."); *Archway Ins. Servs., LLC v. James River Ins. Co.*, Civil Action No. 09-2711, 2010 WL 5079498, at *1 (E.D. Pa. Dec. 8, 2020) (involving Local Civil Rule 7.1(g) and motions for reconsideration).

binding precedent Defendants cite is *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 (3d Cir. 2007), which involved a different procedural posture and is distinguishable. *See id.* at 242 (holding that the district court did not abuse its discretion in granting Rule 16(f) monetary sanctions, where the defendant failed to produce documents until eleven months after the close of discovery "and, even more significantly, on the eve of the last day of trial"). This Court finds that striking Brown's untimely responses to Defendants' motion for summary judgment is a harsh enough sanction and appropriately fits the transgression here.

Having resolved Defendants' motion to strike, the Court now turns to Defendants' summary judgment motion.

## II. Motion for Summary Judgment

### A. Factual Background

Taking the facts in the light most favorable to Brown, the relevant facts are as follows.

#### 1. Brown Begins Working for the City

Brown's employment with the City commenced in 1995, when she started working within the Philadelphia prison system as a corrections officer, a role she held for approximately eleven years. (Doc. No. 36-2, Brown Nov. 4, 2020 Dep. ("Brown Dep. I") at 12:9–13:4.)

In 2006, Brown joined the Sheriff's Office, at which point John Green was the Sheriff. (*Id.* at 14:2–8.) Brown started as a Department Sheriff Officer ("DSO"), a civil service position.[7] (*Id.* at 15:13–20, 26:4–7.)

When an employee holds a civil service position, he or she is hired pursuant to a particular process, which entails a background check, a medical evaluation, an indebtedness

---

[7] Civil service ranks in the Sheriff's Office include DSOR, DSO, DS, Sergeant, Lieutenant, and Captain. (*Id.* at 47:15–21.)

check, completion of a questionnaire, and a criminal history check. (*See id.* at 15:21–21:9.) Since the time Brown was hired, the Sheriff's Office has added a physical agility requirement to the civil service process. (*Id.* at 21:8–22:14.) In addition, to be certified as a deputy in the Commonwealth of Pennsylvania, employees must undergo training at The Pennsylvania State University in State College, Pennsylvania, which lasts nineteen weeks. (*Id.* at 28:14–11, 28:22–29:3.)

Brown served as a DSO for approximately eight years, during which time she worked in a "multitude of areas," including the Criminal Justice Center and the family court division. (*Id.* at 26:14–27, 32:9–14, 56:1–13.) Around 2014, Brown was assigned to the training unit, and she also worked in the internal affairs division and background unit. (*Id.* at 55:18–57:24.)

### 2. Brown Is Promoted to Sergeant

Under Jewell Williams's tenure as Sheriff, Brown was promoted from a DSO to Deputy Sheriff Sergeant. (*Id.* at 38:13–39:3, Doc. No. 36-3, Brown Nov. 9, 2020 Dep. ("Brown Dep II") at 311:6–11.) To be promoted to Sergeant, Brown had to apply for the position on the City's website, undergo an employee medical evaluation, and take a written examination; after passing the written exam, she was placed on an eligibility list that included a ranking system based on examinees' written test scores.[8] (Brown Dep. I at 39:4–44:22.)

Once promoted to Sergeant, Brown's supervisor, Paris Washington,[9] assigned her to the background and training units. (*Id.* at 52:3–18; *see also id.* at 58:1–5.) As Sergeant in the

---

[8] Brown explained that promotions are based on the needs of the agency and if there are extra candidates, those individuals remain on the list for two years. The eligibility list expires after two years and anyone who is still on the list at that point must reapply and "go through the process all over again." (*Id.* at 46:9–47:10.)

[9] Washington held "a multitude of titles" over the years, including the civil service ranks Sergeant and Captain, as well as the in-house rank Deputy Chief. (*See, e.g.*, *id.* at 52:19–53:11, 125:18–24.)

training unit, Brown was responsible for ensuring that the deputies complied with the State requirements for their initial training and were up to date in their annual training thereafter. (*See, e.g.*, *id.* at 58:6–60:14, 61:18–63:23, 72:1–73:3.) As a background investigator, Brown was responsible for processing applicants for purposes of employment as DSOs. (*Id.* at 139:16–18, 164:2–5, 172:10–12.) This involved taking applicants through the civil service process, which, as discussed above, included, *inter alia*, completing the medical evaluation, passing the physical agility exam, and so on. (*Id.* at 135:12–24.)

In addition, Brown supervised uncertified deputies who were undergoing their certification training at Penn State, as well as DSOs. (*Id.* at 76:11–15, 77:7–78:14, 79:18–80:21, 90:1–16.) As a first level supervisor to DSOs, Brown was responsible for giving out assignments, handling her subordinates' time sheets, delegating responsibilities and duties, and approving leave time. (*Id.* at 91:11–92:4.) However, Brown did not have firing power, nor did she have the authority to promote DSOs or raise their pay. (*Id.* at 92:9–17.)

### 3. *In 2019, Sheriff Jewell Williams Runs for Reelection and Brown Does Not Support His Campaign*

The Democratic primary election took place on May 21, 2019, and Jewell Williams ran for another term as Sheriff. (*See, e.g.*, *id.* at 129:3–11, 189:9–10; *see also* Brown Dep. II at 313:18–315:22.) Brown did not support Williams's re-election campaign[10] (*see generally* Brown Dep. I and II), and in the months leading up to the primary, Brown engaged in the following actions, which she now claims constitute protected activity: (1) she opposed the use of Sheriff's

---

[10] Brown never told Williams that she was not supporting his candidacy for Sheriff (Brown Dep. II at 315:23–316:4, 322:5–10), nor did she demonstrate support for any other candidate running for Sheriff (*id.* at 315:14–22). Brown also never told Paris Washington that she was not going to support Williams's re-election campaign, though she did advise Washington that she was not going to "be a part of a political agenda for any candidate." (*Id.* at 316:5–19.)

Office funds to advertise open DSO positions on City buses because, in her view, such advertising was politically motivated (*see, e.g.*, Brown Dep. I at 173:10–23, 177:16–21); (2) she refused to attend an event honoring women because she believed the event was in reality a disguised campaign event and she did not want to be a pawn used to garner women's support for the Sheriff, as she felt that he was not supportive of the promotion of women (*see id.* at 203:2–209:1); and (3) she refused to process several applicants for employment as DSOs because she believed that they did not satisfy the civil service process requirements (*see, e.g.*, *id.* at 135:4–142:22, 162:23–167:3, 215:17–216:4).

### a. Brown Speaks Out Against Bus Wrap Advertisements (*January & February 2019*)

In 2019, the Sheriff's Office was looking to hire candidates to become DSOs. (*Id.* at 177:16–178:21, 179:1–7.) As a result, during the hiring period, a group of Sheriff's Office employees—including Brown, Devon Floyd (a Human Resources employee), and Harriet Lessy[11]—held meetings specific to processing background applicants. (*Id.* at 179:8–22, 180:17–181:9, 182:19–22, 183:2–6, 185:23–186:1.) Although the Sheriff did not attend these meetings, he occasionally would pop in and then leave shortly thereafter. (*Id.* at 184:4–21.)

During one such meeting in early January 2019, someone mentioned that the Sheriff wanted to do a "bus wrap" to advertise that the Sheriff's Office was hiring DSOs. (*Id.* at 186:18–24, 193:9–23.) A bus wrap is an advertisement[12] that wraps around the exterior of a bus

---

[11] Lessy is a civilian employee within the Sheriff's Office. (*Id.* at 179:23–180:12.) Brown testified that Lessy was "strictly" at the meeting so that she could relay anything that happened back to the Sheriff. (*Id.*; *see also* Brown Dep II at 371:4–14 ("She was solely there to communicate anything that happened directly to the Sheriff because she reported to him. So anything that occurred she would go and communicate that to him.").)

[12] The bus wrap included Williams's photograph but did not appear to display his name. Rather, the advertisement directed viewers to visit the Philadelphia Sheriff's Office website as a resource for interested applicants to learn more information about how to become a deputy sheriff. (*See* Doc. No. 41 at p. 133.)

(*see, e.g.*, Doc. No. 41 at p. 133), and the proposed bus wrap would cost about $10,000 (*see* Brown Dep. I at 188:17–23). Brown opposed the idea. (*See, e.g.*, *id.* at 187:1–8, 194:13–195:9.) According to Brown, it was "very obvious" that the bus wraps were only being done for the purpose of "campaign promotion for the [S]heriff . . . because this . . . predated the election." (*Id.* at 173:12–18, 187:20–23; *see also id.* at 187:1–8 ("During the meeting, I was in opposition to it because I knew exactly why it was being done.").) In addition, the bus wraps "did not make any sense to" Brown because there "really wasn't a need . . . to generate attention for processing applicants." (*Id.* at 187:7–20, 189:2–6.) Brown thought that "it just wasn't financially sound or fiscally responsible to do it," and that the $10,000 cost "was completely ridiculous." (*Id.* at 188:6–23; *see also id.* at 194:20–195:1 ("It just didn't make sense and it wasn't fiscally sound. The cost that you're spending to do something of that sort for a small po[o]l of candidates, it just didn't make any sense to me."). Devon Floyd was also not in favor of the idea. (*Id.* at 195:10–21.)

Not long after, the topic came up again when the same group held another meeting about processing new applicants, this time in February 2019. (*Id.* at 195:22–196:15, 197:2–18.) Again, Brown voiced her opposition, stating that "it's not a good idea" and that "it's obvious as to why it was being done. It was being done for the purposes of promoting the campaign pre-election." (*Id.* at 198:1–10.)

Brown believed that the topic arose for a third time in early 2019—in the same context, during a meeting "talking about applicants for the purposes of employment"—and that she opposed the proposition once again, though she could not recall the timeframe that the third instance occurred. (*Id.* at 198:14–200:10)

### b. *Brown Declines to Attend an Event Honoring Women (Early 2019)*

Also in early 2019, Brown's superiors informed her that she should attend an event for women.[13]  (*Id.* at 200:11–201:8, 202:24–203:11.)  First, Deputy Chief Kevin Lamb told Brown that there "is an event that we're having for women, you need to be there."  (*Id.* at 203:8–21; *see also* Brown Dep. II at 435:13–436:2.)  Brown responded that she would not be attending the event, but she did not give him a reason why.  (Brown Dep. I at 204:20–205:7; *see also* Brown Dep. II at 374:3–7.)

Later, within the same week, Brown's supervisor, Paris Washington, approached Brown and told her that the Sheriff "was having an event for women" and that she "needed to be there in order . . . to be promoted" to Lieutenant.  (Brown Dep. I at 203:22–204:19, 207:6–23.)  Brown replied that she would not be attending the event "because [she] knew the reason as to why it was being held."  (*Id.* at 205:10–21.)  Brown explained that "[she] was not going to be utilized as a tool for the purposes of . . . Jewell Williams' political agenda because [she] knew exactly why he was having the event.  And it was to garner favor with women politically.  And [she] was not going to [b]e used as a vehicle for that."  (Brown Dep. II at 374:3–16.)

As noted, Brown's understanding was that the event was for Williams's campaign and she believed that "it was a mechanism of which to garner favor with women prior to the election."  (Brown Dep. I at 205:22–206:5.)  No one ever told Brown that it was a campaign or political event.  (*See id.* at 203:2–209:1.)  But Brown felt that it was "obvious" because it "was prior to the election" and "gives the appearance that you are this elected official that [is] excited

---

[13] Marquet Parsons—who is currently a Captain and Deputy Chief—testified that he believed the purpose of the event was to "deflect" "allegations of sexual harassment" that had been lodged against Sheriff Williams.  (Marquet Parsons Dep. ("Parsons Dep.") at 23:22-24:2.)  Parsons also sued Jewell Williams and the City of Philadelphia and is represented by the same counsel as Brown.  (*See id.* at 24:23–25:7; Doc. No. 41 at p. 126, Parson's Aff. at ¶ 5.)

about promoting women." (*Id.* at 206:6–24.)

Ultimately, the event was cancelled and never came to fruition. (*Id.* at 208:14–20.)

### c. *Brown Refuses to Process Lynwood Savage (January, February, & March 2019), Eric Hill,[14] and Wanda Serrano (July 2019)[15]*

#### i. *Lynwood Savage*

Towards the end of 2018, Lynwood Savage began working at the Sheriff's Office in a civilian capacity and was classified as an exempt employee. (*Id.* at 127:9–128:6, 133:19–134:5.) Initially, Brown did not know who Savage was, and Paris Washington told her that Savage was "specifically brought there for political reasons," to give the Sheriff "political influence," and to "bolster [the Sheriff's] ability to be re-elected for the upcoming election." (*Id.* at 128:11–129:2, 131:8–132:7, 137:17–138:2.) Brown learned that Savage was aligned with U.S. Representative Bob Brady, a "Democratic powerhouse in Philadelphia." (*Id.* at 129:5–130:7; *see also id.* at 132:9–133:10 (testifying that Washington told her that that Savage "received the position within the [Sheriff's] office and it was solely based upon his connection to Brady to propel the sheriff at that time to a second term because of his political connections").) Brown testified that Brady is known as "the king maker," and "If you're looking to be elected, that's someone that people go to for that purpose." (*Id.*) Prior to coming to the Sheriff's Office, Savage was an elected official. (*See id.* at 130:8–131:2 (Brown testifying that Savage obtained his position as a member of the

---

[14] Brown did not indicate when she was asked to process Hill.

[15] Although Brown's focus appears to be on Savage, Hill, and Serrano, the Court notes that she also claims to have experienced push-back when she raised issues about processing a fourth individual, Eric Forrester. Specifically, Brown explained that information "came up with [Forrester's] background that did not allow for" him to be processed as a DSO, and when she informed Sheriff Williams of this, he was "upset with [her] and [her] findings." (Brown Dep. II at 342:20–343:5.) In particular, Brown discovered that Forrester had a criminal history. (*Id.* at 343:10–23.) Notwithstanding this information, Sheriff Williams still wanted Forrester processed. (*Id.* at 344:11–16.) Brown does not recall how she responded to Williams when he said he still wanted to move forward with Forrester. (*Id.* at 344:17–21.)

Pennsylvania House of Representatives "via Bob Brady").)

In January 2019, Washington told Brown that Sheriff Williams wanted her to process Lynwood Savage as a DSO. (*Id.* at 135:4–11, 139:4–13, 140:7–9.) Brown believed the request stemmed from the Sheriff's need "to give [Savage] a job to substantiate his reasoning [sic] for being there," though she also acknowledged that Savage had already been hired as an exempt employee. (*Id.* at 136:1–137:12.) To process Savage, Brown would have taken him through the same steps through which she guides applicants who are already on the eligibility list or part of a civil service process (e.g., the medical evaluation, the physical agility exam, etc.). (*Id.* at 135:12–24.)

Brown opposed the request, asking Washington, "How do you process someone that's not part of an active examination[?]" (*Id.* at 139:19–23.) In other words, because Savage "was not in any type of civil service process," Brown took the position that processing him "was something that could not be done." (*Id.* at 215:23–216:2; *see also* Brown Dep. II at 349:16–18 ("He wasn't a candidate. He wasn't on any civil service examination during that time frame.").) Brown does not recall Washington's response. (Brown Dep. I at 139:24–140:3.)

At the behest of the Sheriff, Washington asked Brown to process Savage two more times, first in February 2019 and then again at the end of February or early March 2019. (*Id.* at 140:10–141:1.)[16] Brown does not recall how she responded to Washington the second time he made the request.[17] (*Id.* at 141:2–5.) However, Brown recalls that at some point during these

---

[16] In Brown's view, Washington's repeated requests that she process Savage illustrated how Washington acted as the "pit bull" for the Sheriff. (*Id.* at 138:5–22.) Brown explained that Washington referred to himself as Sheriff Williams's "pit bull," meaning that "[h]e was the person that would do whatever the Sheriff would ask him to do" and was the Sheriff's "go-to person for anything." (*Id.* at 138:2–139:3.)

[17] However, Brown explained that because Washington told her that Savage had once been a DSO "many, many years ago," she did reach out to the governing authority, Pennsylvania Crime and Delinquency to inquire about Savage's status. (*Id.* at 59:23–60:3, 141:6–15.) Brown learned that Savage had been a

conversations, Washington told Brown that she needed to process Savage in order to be promoted to Lieutenant.  (Brown Dep. II at 341:14–342:19.)

Brown also had a conversation with Williams, in which he "directly said to process Lynwood Savage."  (*Id.* at 345:5–12.)  Brown responded that "[Savage] would have to process just as any other candidate" would, and she noted that, at that time, there was an "active civil service list and Lynwood Savage was not on that . . . list."  (*Id.* at 345:10–18.)  Brown did not recall Williams's response.  (*Id.* at 345:10–347:3.)

### ii.  Eric Hill

In addition, Washington and Sheriff Williams asked Brown to process Eric Hill as a DSO.  (Brown Dep. I at 162:23–163:24; Brown Dep. II at 347:17–22.)  At the time, Eric Hill was not an employee of the Sheriff's Office.  (*Id.* at 163:12–14.)  However, Hill was on the "civil service list initially."  (Brown Dep. II at 349:19–350:7.)  Once "the sheriff had gotten wind of him being on that list, he wanted Eric Hill to be process[ed] further."  (*Id.*)

At the time, Hill worked as a business agent for District Counsel 33, "which was a huge pool of potential people to vote for him" and the reason "as to why [Williams] wanted [Hill] to be processed."  (*Id.* at 349:8–12; Parsons Dep. at 64:2–6 ("Being part of District Counsel 33, yes, [Hill] would have some political connections.").)  (*But see* Brown Dep. I at 163:5–11 (Brown's testimony that the "Sheriff was looking to process [Hill] as a political favor").)

When Sheriff Williams asked Brown to process Hill, she responded that all candidates would "have to be processed in the same way" and that they should not be "going outside of the normal service process."  (Brown Dep. II at 348:3–18.)  Brown does not recall Williams's exact

---

DSO around 1999 and relayed the information to Washington and the Sheriff.  (*Id.* at 142:23–143:5, 141:7–10.)

response, though noted that regardless, he still wanted Hill processed. (*Id.* at 348:19–349:12.)

Brown also recalls that at some point, Washington told her that she needed to process Hill to be promoted. (*Id.* at 341:14–342:19.)

### iii. *Wanda Serrano*

Last, Brown was asked to process Wanda Serrano, who worked in a civilian capacity for the Sheriff's Office but had applied for a DSO position. (*See id.* at 364:19–17; Brown Dep. I at 164:6–165:3.) When Sheriff Williams told Brown he wanted Serrano processed, she replied that Serrano was already "in the process." (Brown Dep. II at 365:18–23.)

On June 29, 2019, the Background Investigations Unit conducted the physical agility test for DSO candidates (Doc. No. 41 at p. 135), after which Brown became aware that Serrano had not fulfilled the physical agility requirement (*see* Brown Dep. I at 164:6–165:3). Specifically, although Serrano completed the requisite vertical jump, sit-ups, and 1.5 mile run, she did not complete the 300 meter run or push-up components of the test; consequently, her physical agility test was marked incomplete. (Doc. No. 41 at p. 135.) Brown subsequently notified others in the Sheriff's Office about this issue. (Brown Dep. I at 164:6–165:3.)

In July 2019, Ben Hayllar (the Chief Financial Officer of the Sheriff's Office during Sheriff Williams's administration) told Brown, "She's one of our own, we need to process her." (*Id.* at 164:18–165:3, 165:16–12, 166:15–167:3; *see also* Doc. No. 41 at p. 135.) Brown took this to mean that Hayllar "wanted [her] to forgo reporting that information" and "not to consider what happened with [Serrano's] agility component" when "considering [Serrano] in the process." (Brown Dep. I at 171:19–172:7.) Brown also knew that Serrano had filed a sexual harassment complaint against another Sheriff's Office employee, Richard Verrecchio, and Brown understood "that the agreement was to more or less process [Serrano] in response to her filing [the complaint] against Verrecchio." (*Id.* at 167:4–168:13.)

### 4. Brown Is Subsequently Excluded from Events, Is Passed Over for a Promotion, and Has Her Work Vehicle Reassigned, Among Other Things

Brown claims that, as a result of her opposition to the bus wraps, her refusal to attend the event honoring women, and her opposition to processing certain candidates for employment as DSOs, the tide at the Sheriff's Office turned against her. Specifically, Brown asserts that she suffered from an onslaught of adverse employment actions, starting in January 2019 after the first meeting about the bus wraps and lasting through the rest of 2019. (*See generally* Brown Deps. I and II; *see also* Doc. No. 22.) Brown claims that, prior to the May 2019 primary, she was excluded from participating in an investigation of her subordinate, was excluded from attending a Martin Luther King, Jr. Day service event, was interrupted and scolded while leading a training, had certain uniform privileges revoked, and had her work vehicle transferred. According to Brown, after Williams lost the primary, she experienced another wave of adverse actions, including having her friend transferred out of her unit, being excluded from a subordinate's promotional ceremony, being passed over for a promotion, receiving few overtime opportunities, having her authority diminished, and being falsely accused of leaking information to the press. We address each in turn below.

### a. Brown Does Not Get to Participate in an Investigation of Her Subordinate (January 2019)

As a Sergeant, Brown supervised approximately five DSOs, one of whom was Deputy Stacy Woods. (Brown Dep. I at 76:11–78:14, 79:18–80:4.) In early January 2019, the Sheriff's Office became aware of allegations that Woods had engaged in misconduct. (Brown Dep. II at 396:8–11.) Notwithstanding the fact that Woods reported directly to Brown, Brown was not assigned the task of conducting the investigation into the alleged misconduct. (*Id.* at 394:7–398:12, 420:18–4.) According to Brown, Sheriff Williams said that she was "too strong of a Black woman" to do the investigation. (*Id.* at 394:7–396:7, 412:9–18.)

Brown did not recall who was assigned to conduct the investigation within the Sheriff's Office.[18]  (*Id.* at 396:12–16.)  Although Brown was upset that, as Woods's immediate supervisor, she was not assigned to lead the investigation, she did not express these feelings to Williams, nor did she ask Williams why she had not been assigned to lead it.  (*Id.* at 396:17–398:8.)  Brown believed this was done in retaliation for her opposition to the bus wraps.  (*Id.* at 420:18–421:4.)

### b. *Brown Is Not Invited to a Martin Luther King, Jr. Day Event (January 2019)*

Also in January 2019, Brown was not invited to a Martin Luther King, Jr. Day service event that the Sheriff's Office organized and held at a local church.  (Brown Dep. I at 174:11–19, 210:1–211:2, 214:13–18.)  Brown learned of the event's existence during conversations that came up around the office, which included conversations she had with two DSOs who she supervised and who were drivers for Sheriff Williams.  (*Id.* at 211:6–212:14.)  Brown did not know how other employees were invited to the event.  (*Id.* at 214:6–12.)

### c. *Brown Is Interrupted and Scolded While Leading a Training and Has Her Class C Uniform-Wearing Privileges Revoked (January 2019)*

Next, on January 26, 2019, Brown led an orientation "for candidates that were processing for background"—a task she had completed many times before.  (*Id.* at 295:16–298:3.)  Members of Brown's staff and the Human Resources department were also present to assist.  (*Id.*)

During the orientation, Paris Washington appeared and caused a scene.[19]  (*Id.*)  Knowing

---

[18] Part of the complaint against Woods involved allegations that she was present in a residence at the time an AR-15 was recovered from that residence.  (*Id.* at 412:19–1.)  As a result, the investigation was ultimately assigned to the Philadelphia Police Department or District Attorney's Office.  (*Id.* at 413:2–22.)

[19] Brown claims that Washington's disruption was done in retaliation for her vocalizing her opposition to the bus wraps during a meeting held earlier on in January.  (*See id.* at 300:19–301:18.)  That said, Brown has not provided evidence that anyone in that meeting told Washington or the Sheriff that she opposed the

"his mannerisms," Brown could tell "that there was something that was bothering him," and Brown believed that "he essentially was upset [with] [her] direction in leading the orientation." (*Id.*)

Washington "yelled at [Brown] in front of other staff and subordinates" and announced that he wanted to speak with her. (*Id.*) They then went into a separate room next to where the orientation was being held, at which point Washington walked towards Brown, "backed [her] into a corner," and "menacingly placed his fingers in [her] face" and "yelled at [her]."[20] (*Id.*; *see also id.* at 298:4–16; *accord* Parsons Dep.[21] at 41:11–42:8, 60:16–63:4.)

The following day, Brown's Class C uniform privileges were revoked "and policies were altered specific to that." (Brown Dep. II at 430:4–9.)[22]

---

bus wraps. (*See id.* at 301:16–302:1 (Q: And you said earlier that Paris Washington and Jewell Williams were not at that January 2019 meeting. So what leads you to believe that they were even aware that you said anything about bus wraps? A: Any time that there was a meeting, Paris Washington and Jewell Williams knew what was going on in that office."); *see also* Brown Dep. II at 371:15–20 (Brown's testimony that she did not tell Williams that she opposed the bus wrap); *id.* at 370:15–371:14 (Brown's testimony that she did not recall Williams being present at the bus wrap meeting and admitting that she did not "have firsthand knowledge" that anyone who attended the meeting then told Williams that she opposed the wraps).) In addition, Brown was not the only one who opposed the bus wraps. (*See* Brown Dep. I at 195:10–21.)

[20] Brown alleges that Sheriff Williams instructed Washington to disrupt the orientation, pointing to the fact that the Sheriff knew she was conducting the orientation and would "oftentimes send [Washington] to different events." (*Id.* at 299:17–300:8.) However, when pressed on what evidence she had to support this allegation, Brown could not cite to any and simply repeated that "[t]here wasn't a need for Paris to be there." (*Id.* at 300:9–18.)

[21] Parsons assisted with the orientation, and after witnessing this incident, he reported it to the City of Philadelphia, Risk Management. (Parsons Dep. at 43:4–45:11.)

[22] A Class C uniform is "more relaxed" than the Class A or Class B uniforms, and includes cargo-like pants and a sheriff's insignia long or short-sleeve shirt. (Brown Dep. I at 97:10–98:12.) The Class A uniform is used for "ceremonial events" and not typical day-to-day wear. (Brown Dep. I at 93:7–95:4.) The Class B uniform "is usually what you see most deputies or most officers in," and consists of a white shirt and black pants for supervisors and light blue shirts and black pants with a stripe for deputies. (*Id.* at 95:5–12.)

### d. *Brown's Vehicle Is Transferred to a Civilian (March 1, 2019)*

Around 2014 or 2015, when Brown was still a DSO, the City provided the training unit with an unmarked Ford Escape vehicle, and Washington assigned it to Brown as "the training unit personnel." (*Id.* at 144:3–23, 146:7–13; *see also* Brown Dep. II at 356:24–357:6 (testifying that the Ford Escape was assigned to her by "Paris Washington through Sheriff Williams because he was solely responsible for the fleet within the office").)[23]

Brown used the vehicle to drive "to and from work for work activities." (Brown Dep. I at 143:14–23, 145:11–14.) Brown explained that the Ford Escape, which had lights and sirens, was an emergency vehicle to use so "if you were called into service [at any point] you have a way of reacting and/or responding to wherever that said event was." (*Id.* at 151:4–19, 152:7–13.) When pressed for examples of any emergencies that she actually responded to from her home, Brown cited to one instance, in either 2018 or early 2019, when she responded to a call about a Sheriff's Office employee being arrested for a domestic dispute. (*Id.* at 153:13–154:19.)

On March 1, 2019—shortly after Brown was once again asked to process Savage as a DSO—Washington informed Brown that, "per the Sheriff," the vehicle was being transferred to Savage. (*Id.* at 146:18–147:6, 149:17–23; Brown Dep. II at 357:22–358:15, 361:5–11, 362:24–363:6.) Aside from the fact that the vehicle was transferred away from her, Brown took issue with the transfer to Savage for two other reasons: First, Savage appeared to suffer from narcolepsy and could be "found sleep snoring very loudly" and would fall asleep in the midst of a conversation, such that Brown believed it was "dangerous" for him to be operating a vehicle

---

[23] This appears to be an informal assignment, as Brown was not aware of any paperwork that memorialized it. (*See id.* at 144:14–17.) And although Brown occasionally filled out a vehicle log sheet when she took the vehicle home, she did not do so consistently, despite taking the vehicle home each night. (*Id.* at 155:11–156:5.)

(*see id.* at 423:1–424:14); and second, because Savage had not gone through the civil service process, he would be operating an unmarked vehicle with lights and sirens as a civilian, in violation of Title 75 of the Motor Vehicle Code (*see id.* at 424:18–24).

Brown did not have any discussions with Jewell Williams about the transfer of the vehicle. (*Id.* at 358:16–360:4.) Brown did, however, ask Washington why the Ford Escape was being transferred, but she could not "remember exactly what was said." (*Id.* at 360:16–23; *but see* 361:12–16 (Brown's testimony that she did not recall asking Washington why he assigned the Ford Escape to Savage).) Thus, neither Washington nor Williams directly communicated to Brown why they were transferring the vehicle to Savage. (*Id.* at 362:20–363:6.) Regardless, Brown maintains that she "knew why it was being transferred": "[i]t was because [she] was not politically loyal to the agenda of Sheriff Williams." (*Id.*; *see also id.* at 360:24–36.)

Although Brown was not assigned another vehicle to take home under the Williams administration, she had access to other Sheriff's Office vehicles during the workday and used those whenever a specific job arose during work hours. (*Id.* at 361:17–362:19.) However, she would "literally have to look for a vehicle" that was available each time she needed one. (*Id.*)

### e. *Brown's Friend Within the Unit Is Transferred (July 2019)*

On July 20, 2019—two months after Sheriff Williams lost the primary and not long after Brown had expressed concern about Serrano's failure to complete her physical agility requirement—Washington and Williams transferred Brown's friend and co-worker Lieutenant Marquet Parsons "out of the office," which "isolated" Brown and made her feel "kind of ostracized." (*Id.* at 427:1–24; Brown Dep. I at 124:17–125:7.) Parsons had been a Lieutenant within the training unit. (*Id.* at 124:17–20.)

### f. Brown Is Not Invited to a Subordinate's Promotional Ceremony (September 2019)

On September 4, 2019, one of Brown's subordinates, Jared Devine, was promoted and moved from the training unit to the civil unit. (Brown Dep. I at 106:15–107:12, 232:4–17.) When an employee is promoted (e.g., DSO to Sergeant or Sergeant to Lieutenant), there is a promotional ceremony held in his or her honor, which is "invite only." (*Id.* at 104:23–111:4.) Supervisors and "command staff" are typically invited to attend the event when their subordinates are promoted. (*Id.* at 105:2–105:16; *see also id.* (explaining that "command staff" are your "sergeants, lieutenants, and captains" and that "they would be invited to an event"); Brown Dep. II at 425:11–24.)

As a result, it came as a surprise to Brown that, despite being Devine's immediate supervisor, she was not invited to his promotional ceremony. (Brown Dep. I at 232:4–17; *see also id.* at 233:3–14 (Brown's testimony that she did not receive an invitation and that she "would imagine" that as "the person's supervisor," as a "courtesy" someone would say, "hey, your employee is being promoted, we're having an event at said time").) In fact, Brown was not even aware that Devine was being promoted until the day of the ceremony. (*Id.* at 233:22–234:11.) In Brown's view, "[t]he Sheriff should have informed" her of this since she supervised Devine. (*Id.* at 234:12–235:5.)[24]

### g. Brown Does Not Receive a Promotion (September 2019)

In addition to her frustration over the Sheriff's failure to notify her about Devine's promotion, Brown was also upset that she was not promoted herself. In September 2019, Brown expected to be promoted and was on the eligibility list for promotions at that time. (*Id.* at 235:6–

---

[24] Brown also was not invited to a promotional ceremony in August 2019, though she did not specify who was being promoted at that time. (Brown Dep. II at 332:15–334:4.)

15 ("I expected to be promoted because there was not a reason to not promote me."); *see also id.* at 235:16–236:2 (explaining that she expected to be promoted because she was "number six on the eligibility list," was the highest-ranked female, had no disciplinary actions taken against her, and had no issue with her attendance, so "there wasn't a reason to not promote [me]").)

Brown had taken the oral exam that was required for promotion from Sergeant to Lieutenant in 2018. (*Id.* at 114:24–118:11, 119:2–12, 120:3–8.) Brown passed the exam and was ranked number six on the eligibility list, out of the fifteen or so others on the list. (*Id.* at 118:12–22.) That eligibility list remained active in September 2019, and yet others who ranked lower than Brown were promoted over her on September 4, 2019. (*Id.* at 254:19–255:22, 257:20–258:2.)[25]

Specifically, James Bozarth and William Moore were each promoted to Lieutenant but ranked seven and eight on the eligibility list. (*Id.* at 246:11–247:1.) Brown did not know why they were promoted, because she believed they had not met the "requisite criteria" for the promotion, as she had heard through conversations within the Sheriff's Office that neither had completed the medical evaluation. (*Id.* at 247:2–16; 248:24–249:19.) Moore had prior experience in the warrants unit before to being promoted to Lieutenant of the warrants unit, but according to Brown, specific experience should not be factored into promotional decisions. (Brown Dep. I at 241:4–242:5 ("The criteria for a promotion are not based off the unit that you're in.").)

On September 9, 2019, shortly after Bozarth and Moore were promoted, Brown filed a

---

[25] That said, like Brown, Sergeant Achley was not promoted to Lieutenant in September 2019 either, even though he ranked even higher than Brown and was number three on the list. (*Id.* at 244:3–246:4.) Instead, Achley was promoted in 2020 under the new administration, around the same time as Brown. (*Id.*)

grievance with the Fraternal Order of the Police ("FOP"). (*Id.* at 251:20–24, 253:19–254:7; Brown Dep. II at 353:20–23.) When Brown spoke with Roosevelt Poplar of the FOP, she complained that she had not been promoted, stating that "there was not a reason to not promote [her]" and she "felt that [she] was overlooked and [] should not have been." (Brown Dep. I at 253:19–254:12.) In addition, Brown explained that she felt that Williams and Washington[26] had retaliated against her by passing her over on the promotional list, and that she felt "very strongly as to . . . the reason behind" why she was not promoted," given "all that had occurred over the year 2019." (*Id.*) Brown "directly knew" that she was not promoted because of her "opposition to the office under that administration and just not wanting to be in alignment with them and just not being politically loyal." (*Id.* at 258:5–11.) However, Brown could do not explain how she "knew" this; rather, she stated that her "evidence lies on the fact that [her] promotion did not happen until 2020," under the new administration. (*Id.* at 258:5–259:5.)

After Brown filed her grievance, Shantae Coppock, who was also ranked lower than Brown, was promoted. (Brown Dep. II at 350:8–351:12, 353:7–19 ("After my grievance specifically to not being promoted and being gender-specific they promoted Shantae Coppock as a result of my losing because she was a woman.").)

Ultimately, promotions are based on operational need (*see* Brown Dep. I at 236:20–23) and are not based on rank alone (*see id.* at 237:10–18 (Q: But just because he's number one on the list, does that mean that he necessarily will be promoted? A: It doesn't necessarily mean that he'd be promoted. It's just one of the reasons as to why you would promote him[.]"); *see also id.* at 238:5–18 (explaining that in addition to rank, there are other requirements that should be

---

[26] Brown admits that Washington cannot make promotion decisions "legitimately," but asserts that "he does have influence." (*Id.* at 254:13–18.)

looked at when deciding who to promote, including "a person's performance rating," "a person's attendance," and "whether or not a person has disciplinary matters that have been held against them").) Brown agrees that the Sheriff is permitted to promote a lower-ranked candidate ahead of a higher-ranked candidate, but asserts that he "would have to give reasons why" and "the process of which it's being done [must be] done across the board," such that the criteria does not change from person to person. (Brown Dep. II at 339:24–340:17.)

### h. Washington Micromanages Brown and Requires Her to Check in With Him Each Day, and Brown's Authority Over Her Direct Reports Is Diminished (September to December 2019)

Towards the end of 2019, Washington took steps that increasingly upset Brown, all of which she viewed as retaliatory, particularly given that they followed Sheriff Williams's loss in May. For example, Washington sent an email to Brown and her subordinates, stating: "Effective [this date] all the signed staff shall conduct a radio check with the supervisor reporting on duty, out to lunch, and off duty." (Brown Dep. I at 272:18–273:12.) Brown thought it was "absolutely insane" that she had to notify Washington when "she was out on a personal" (e.g., going to the bathroom), especially given that others who "have a radio can hear that's what I'm doing." (*Id.* at 273:13–274:13.) Brown forwarded the email to employees of the City's Employee Relations Unit ("ERU") to show "[i]t was consistent with the way she was treated within the office." (*Id.*) Although Brown could not recall whether any of her subordinates announced on the radio that they were going on a personal, she noted that Paris would radio in when he went on a personal. (*Id.* at 274:19–275:7; Brown Dep. II at 393:8–12.)

Around this same time frame, on October 15, 2019, Washington also stripped Brown of her ability to approve her subordinates' leave slips, stating that he "wanted to see the deputies" himself. (*Id.* at 388:20–389:18, 404:11–18, 432:12–16; *see also id.* at 400:22–401:7 (explaining that Washington "circumvented [her] authority as supervisor because . . . he had the subordinates

27

that fell directly under [her] reporting to him" and took away "the ability to approve their leave slips, the ability to sign off on their timekeeping").)  Washington also took away Brown's ability to review her subordinates' timesheets.  (*See, e.g.*, *id.* at 405:6–7.)  Brown felt that by "taking [away] basic responsibilities and roles that [she] had as a supervisor," Washington diminished her role and "devalued" and "underappreciated" her.  (*Id.* at 402:19–403:20, 404:19–405:21.)

In addition, Washington required Brown and his other direct reports to check in with him.  (*Id.* at 390:6–14; *see also id.* at 402:15–19, 404:5-11.)  According to Brown, "the Sheriff wanted to know [her] whereabouts and what [she] was doing" because he blamed her for not winning the election.  (*Id.* at 390:14–391:3; *see also id.* at 393:13–394:6, 406:5–10.)

Finally, due to the mounting ostracization and mistreatment Brown felt, "it became very difficult [for her] to even come to work," so she used "quite a bit" of accumulated sick and vacation time.  (*Id.* at 410:5–411:21.)  Brown felt that her use of sick time was questioned as a result.  (*Id.*)

### i. *Brown Receives Few Overtime Opportunities (September to December 2019)*

In its civil capacity, the Sheriff's Office had responsibility related to Protection From Abuse ("PFA") orders, and Paris Washington oversaw that project, known as Operation Quick Start, which fell within Brown's unit.  (Brown Dep. I at 218:13–219:9.)  Operation Quick Start "described the PFA process and notifications of those who had PFAs against them."  (*Id.* at 219:13–17; Brown Dep. II at 429:16–430:3.)  Given the voluminous amount of PFAs that came through the system, the employees who did work for Operation Quick Start earned overtime.  (Brown Dep. I at 219:13–22.)

When Sheriff Williams and Washington attended a Chief of Police conference in Chicago, they "specifically look[ed] for someone to oversee the PFA process" in their absence.

(Brown Dep. II at 387:14–388:8.)  Ultimately, on September 27, 2019, Lynwood Savage was designated the overseer during this time.  (*Id.*; *see also id.* at 430:10–21.)  Brown took issue with this designation and considered it inappropriate that a nonuniformed civilian and exempt employee, such as Savage, would be overseeing the operations within her unit, at least as it pertained to Operation Quick Start and the PFAs.  (*See, e.g.*, *id.* at 406:16–407:13, 430:22–431:9; *see also id.* at 442:3–14 ("I was a certified deputy . . . and he had a civilian working in a capacity that I should have been in addition to overseeing the project.").)  Brown was also upset that Savage had the authority to oversee Operation Quick Start when he had not been a part of the initial meetings related to the PFA process that occurred when the law changed in 2018 and early 2019, whereas she had been.  (*Id.* at 405:7–17.)

According to Brown, Washington and Savage used the fact that overtime was a part of Operation Quick Start to their advantage.  (Brown Dep. I at 219:23–220:7.)  In particular, Washington and Lynwood Savage knew "that they had the ability to work whenever they wanted[,] on any day they wanted," including Saturdays (which were paid at time and a half) and Sundays (which were paid at double time), and would "go out to complete the PFAs" with this knowledge in mind.  (*Id.* 219:23–220:7, Brown Dep. II at 441:6–11; *see also id.* at 440:24–441:5 (explaining that Washington, Savage, and warrants unit deputies, who offered assistance, served the PFAs, which gave Washington and Savage "the ability to frequently work Saturdays and Sundays and [they] could essentially write their own checks").)

Although Brown earned $6,500 of overtime during the period September 1, 2019 to December 1, 2019, doing work specific to processing applicants or training, Brown did not earn overtime through Operation Quick Start and was "not a part of that overtime-making process." (Brown Dep. I at 228:14–230:12; Brown Dep. II at 377:18.)  Brown believed that she was

entitled to participate in Operation Quick Start because she was the first level supervisor of the unit that the project fell under and was the only supervisor other than Washington who oversaw the entire unit. (Brown Dep. I at 227:8–19.) Brown asserts that Sheriff Williams excluded her from earning overtime through Operation Quick Start, though admits that she lacks "independent knowledge" of Williams instructing anyone to not assign her overtime. (Brown Dep. II at 378:17–379:8.)

### j. Brown Is Falsely Accused of "Snitching" (November 2019)

Relatedly, in November 2019, during a meeting about PFA orders, Sheriff Williams and Paris Washington falsely accused Brown of talking to a reporter about inadequacies in the PFA notification process. (Brown Dep. I at 217:16–218:12; Brown Dep. II at 407:23–409:6, 411:6–8.) Williams and Washington did not specifically call Brown out as the source of the leak, but she believed it was clear that they were referring to her because she was the only person in the room other than Savage. (*Id.* at 408:16–24.) After that incident, "it was said that there would be actions taken against [Brown]." (Brown Dep. I at 218:4–6.)

### k. Lieutenant Palmer Is Brought over to Brown's Unit (November 2019)

Then, also in November 2019, Lieutenant Craig Palmer was transferred to the training unit and, as a Lieutenant, he fell ahead of Brown in the chain of command and she was expected to report to him. (*Id.* at 276:7–277:10; Brown Dep. II at 383:4–12, 384:19–385:5.) According to Brown, this was done so that Sheriff Williams and Paris Washington could "disregard [Brown] as the supervisor of the unit" and directly deal with Palmer instead of her. (Brown Dep. I at 276:7–277:10 (Brown's testimony that the move was "definitely" done "as a result of [Brown's] opposition to the things that were going on and that [she] reported"); *see also id.* at 277:20–24 ("He was specifically brought over . . . [so] that they could discuss things with him as it relates to

the training unit because I was not politically loyal enough to have discussions with them."); Brown Dep. II at 384:19–385:5 (Brown's testimony that Paris Washington informed her that Palmer was now her "direct report" and that "all communications" should "go through [Palmer]").)

The transfer frustrated Brown and Palmer alike. In fact, on November 25, 2019, Palmer sent a memorandum to Sheriff Williams about Paris Washington's "troubling" behavior and how Washington used him "as a 'proxy' against Sgt. Brown." (Doc. No. 41 at p. 138.) Palmer explained that he would "not be the 'subject' either directly nor indirectly, for someone else's 'personal' agenda" and requested to have the transfer reversed. (*Id.*)

### 5. *Brown Suffers Health Effects (November 22, 2019)*

Due to the culmination of these incidents, Brown suffered a mixed anxiety-depressive-type attack on November 22, 2019 around 9:30 a.m. (Brown Dep. I at 283:17–285:14; Doc. No. 41 at p. 141.) Chief Inspector Richard Verrecchio completed a City of Philadelphia, Accident, Injury & Illness ("COPA II") report afterwards, noting that Brown had come to him "visibility upset in a fit of anger / crying." (Doc. No. 41 at p. 141.) Verrecchio wrote that Brown said, "Deputy Chief Washington keeps harassing me" and "I am going to fuck him up." (*Id.*) As a result, Verrecchio determined that Washington was "emotionally compromised and not fit for duty." (*Id.*)

### 6. *The New Administration (2020)*

Once Rochelle Bilal became Sheriff in 2020, the tide turned again, and Brown was promoted to Lieutenant of the training and background units in July 2020 (Brown Dep. I at 53:19–54:10, 120:9–121:4, 123:10–21) and was assigned a new work vehicle, a Dodge Charger (*id.* at 158:7–160:15).

In early 2020, Brown initiated the instant action (*see* Doc. No. 1), and now asserts First Amendment retaliation claims for the conduct that she experienced in 2019 at the hands of Sheriff Williams and his administration (*see* Doc. No. 22).

### B. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation

omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

"To state claim for relief under Section 1983, 'a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States.'" *Spiker v. Whittaker*, 553 F. App'x 275, 278 (3d Cir. 2014) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013)). "Section 1983 does not confer any substantive rights. Rather, it 'merely provides a method for vindicating rights elsewhere conferred.'" *Washington v. Hanshaw*, 552 F. App'x 169, 172 (3d Cir. 2014) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

### C. Discussion

Brown's First Amendment free speech and political retaliation claims are brought pursuant to § 1983. "To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (cleaned up); *Javitz v. County of Luzerne,* 940 F.3d 858, 863 (3d Cir. 2019); *see also Hill v. Borough of Kutztown*, 455 F.3d 224, 241 (3d Cir. 2006); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action."). Even if the plaintiff

satisfies those elements, however, the government may avoid liability by showing that it would have taken the same action even in the absence of the protected conduct. *Baloga*, 927 F.3d at 752; *Ambrose*, 303 F.3d at 493 (citations omitted).

### 1. Free Speech Retaliation

It is well-settled that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, public employees' First Amendment protections are not limitless either. "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417 (2006) (collecting cases); *see also id.* at 420 ("Underlying our precedent has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." (quotation marks and citation omitted)).

As the Third Circuit has recognized, a public employee's statement is protected by the First Amendment when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern; and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other members of the general public' as a result of the statement he made." *Hill*, 455 F.3d at 241–42 (quoting *Garcetti*, 547 U.S. at 418); *see also Baloga*, 927 F.3d at 753; *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009). The final element involves the need for a "careful" balancing "between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (cleaned up); *see also Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 990–91 (3d Cir. 2014).

Brown cannot satisfy this test because she neither spoke as a citizen or about a matter of public concern, and, as such, Defendants are entitled to summary judgment on her free speech retaliation claim.

### a. Citizen Speech versus Employee Speech

As a threshold matter, this Court must first address whether Brown spoke as a citizen when she opposed the bus wraps, refused to process certain candidates as DSOs, and refused to attend the event honoring women, or whether those statements fell within the realm of her ordinary job duties.

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes[.]" 547 U.S. at 421; *see also Gorum*, 561 F.3d at 185 ("Put another way, the First Amendment does not shield the consequences of 'expressions employees make pursuant to their professional duties.'" (quoting *Garcetti*, 547 U.S. at 426)). In that case, the plaintiff, a prosecutor, claimed that he engaged in constitutionally protected activity when he wrote a memorandum for his supervisors that "address[ed] the proper disposition of a pending criminal matter." *Garcetti*, 547 U.S. at 414, 422. The Supreme Court disagreed. *Id.* at 421–22. The Court reasoned that the plaintiff did not write the memo as a citizen, but rather while carrying out his professional duties as a prosecutor and calendar deputy:

> [The plaintiff] did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [the plaintiff] acted as a government employee.

*Id.* at 422. In so holding, the Supreme Court explicitly recognized that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any

liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22.

Importantly, however, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. In *Lane v. Franks*, the Supreme Court clarified its *Garcetti* holding, stating that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 239–40 (holding that the plaintiff (the director of a statewide program for underprivileged youth) engaged in protected speech when he testified about his reasons for terminating an employee even though he "learned of the subject matter of his testimony in his course of his employment," because testifying in court proceedings fell outside the scope of his ordinary job responsibilities as program director); *see also Flora v. County of Luzern*e, 776 F.3d 169, 180 (3d Cir. 2015) ("While certain statements in [the plaintiff's] complaint do suggest that the speech at issue bore some relation to his job duties and may have, indirectly, benefited his clients, that does not bring the speech within the realm of his ordinary job duties.").

To determine whether Brown's statements constituted citizen speech, we must consider the scope of her ordinary job duties as Sergeant of the training and background units and whether those statements fell outside that umbrella. This analysis involves "a mixed question of fact and law," since "the scope and content of a plaintiff's job responsibilities is a question of fact" while "the ultimate constitutional significance of those facts is a question of law." *Id.* at 175 (quotation marks and citations omitted).

The Supreme Court has not set forth a "comprehensive framework for defining the scope of an employee's duties." *Garcetti*, 547 U.S. at 424–25; *Morris v. Phila. Hous. Auth.*, 487 F.

App'x 37, 39 (3d Cir. 2012). However, it has instructed that

> [t]he proper inquiry is a practical one. Formal job descriptions bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* In conducting this inquiry, courts in this Circuit consider the "audience of [the] employee's speech," *Barnes v. Brown*, Civil Action No. 16-214, 2016 WL 5376023, at *8 (E.D. Pa. Sept. 26, 2016) (citation omitted); whether "the mode and manner of [the employee's] speech were possible only as an ordinary corollary as to his position as a government employee," *DeRitis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017); whether the speech was "part of the work [the plaintiff] was paid to perform on an ordinary basis," *id.*; "whether there is a 'relevant analogue to [the] speech by citizens who are not government employees,'" *Morris*, 487 F. App'x at 40 (citation omitted); and whether the speech was "derived from special knowledge or experience acquired on the job," *McAndrew v. Bucks Cnty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 498 (E.D. Pa. 2013) (quotation marks and citations omitted)). Overall, "the line between citizen speech and employee speech varies with each case's circumstances," and the Third Circuit has cautioned lower courts that they cannot rely on "simple tests" to differentiate between the two. *DeRitis*, 861 F.3d at 454.

First, the Court concludes that Brown spoke as an employee when she opposed using Sheriff's Office funds to advertise DSO positions on City buses during meetings. Viewing the facts in the light most favorable to Brown, as we must at this stage, it is true that Brown's job duties do not encompass the procurement or recruitment of cadets. (Brown Dep. II at 432:17–24; Parsons Dep. 54:2–6; *but see id.* at 11:1–8 ("2019, Angie did it all . . . she did recruitments, she did background of those recruits."), 84:6–14.)

But, as Brown's testimony makes clear, Brown was responsible for processing applicants

and, in furtherance of that job responsibility, she attended meetings about processing. Indeed, Brown admits that the meetings in which she opposed the bus wraps were held for the specific purpose of discussing the processing of applicants.[27] (*See, e.g.*, Brown Dep. I at 179:11–15 ("We would have meetings regarding background of applicants that . . . we were processing and the conversation [about bus wraps] came up at the meeting]"), 180:17–19 ("[T]he meetings were specific to processing applicants[,] background applicants. . . . [T]he meetings would occur specific to that. Then this bus wrap thing came up and it was talked about at the meeting."), 183:2–6 ("It was a background investigation meeting. So background and human resources worked together with processing applicants for the purposes of employment."), 185:24–186:6, 186:18–24, 187:15–17, 194:2–6 ("The conversation was about a bus wrap and it was something specifically regarding us processing applicants."), 197:2–4 ("[W]e were talking about processing applicants."), 197:15–18, 199:23–200:5 (stating that the third meeting in which she opposed the bus wrap idea "would have been contextualized in the same situation . . . talking about applications for the purposes of employment").) Further, Brown's testimony also shows that there was, in fact, a connection between the bus wraps and the processing of applicants. (*See id.* at 187:24–188:6 ("[I]t was said that they would do [the bus wraps] for processing applicants."); *id.* at 188:24–189:8 (explaining that she thought the cost of the bus wraps was "ridiculous" because "there was not a need to do that for the purposes of processing applicants. We already had—I believe at that time we would have an eligibility list."); *id.* at 194:2–6 ("The conversation

---

[27] Brown was far more than a passive observer in these meetings. Even though there "wasn't necessarily a meeting lead," Brown and Devon Floyd served as the de facto meeting leaders or, at minimum, they played pivotal roles in these meetings. (*See id.* at 185:22–186:6 ("Q: Who was the meeting lead? A: ". . . It was a discussion about processing applicants. So because myself and Devon did a lot of the processing . . . it would have been things that we would have been in tune with.").)

was about a bus wrap and it was something specifically regarding us processing applicants.").)[28]

The Court is mindful that the mere fact that Brown's speech somehow concerned either her job duties (e.g., processing applicants) or information she learned during the course of employment does not automatically compel the conclusion that her speech fell within the scope of her job duties. S*ee, e.g.*, *Lane*, 573 U.S. at 239–40. But, as discussed in detail below, the context of the speech reveals that this case involves far more; the undisputed facts show that Brown's case is distinguishable from cases in which courts have found that the plaintiff's speech did not fall within the scope of his or her ordinary job duties.[29]

We also acknowledge that the Supreme Court and Third Circuit have cautioned against permitting the government to create "excessively broad job descriptions" for its employees. *See, e.g.*, *Williams v. City of Allentown*, 804 F. App'x 164, 168 (3d Cir. 2020) (quoting *Garcetti*, 547 U.S. at 424). However, Brown urges us to go too far in the other direction and too narrowly

---

[28] Moreover, the record illustrates that, as part of her official duties as Sergeant, Brown worked with new hires and led orientations for "eligibility candidates" as part of their pre-employment process. (*See, e.g.*, Brown Dep. II at 325:6–14 (Brown's testimony that she led an orientation for "eligibility candidates," who "were getting information on the nuances of the job preemployment" and were not yet "active employees"); Brown Dep. I at 59:2–15 (Brown's testimony that she develops training for new hires and does the "initial things you do to develop new employees," such as "introducing them to law enforcement and what the sheriff's office does"); *see also* Doc. No. 22, Compl. at ¶ 58 ("[O]n January 26, 2019, Sheriff Williams sent Paris Washington to disrupt Plaintiff's leading of a new recruit orientation.").)

[29] *Cf. Javitz*, 940 F.3d 858 (holding that the plaintiff, a human resources director, spoke as a citizen when she reported that a union representative illegally recorded her, since reporting crimes was not within the realm of her job duties); *Dougherty*, 772 F.3d at 989 (concluding that a former employee of the school district did not speak "pursuant to his office duties" when he "disclosed details" to *The Philadelphia Inquirer* about the superintendent's "alleged misconduct in awarding" a prime contract to a particular contractor, given that communicating with the press was not part of his routine job responsibilities as Deputy Chief Business Officer for Operations or Acting Chief of Operations for the Office of the Deputy Superintendent); *Reilly v. City of Atlantic City*, 532 F.3d 216, 231 (3d Cir. 2008) (finding that a police officer who assisted in a state investigation of a fellow officer spoke as a citizen when he testified at trial because "the duty to testify has long been recognized as a basic obligation that every citizen owes his Government" (cleaned up)); *see Barnes*, 2016 WL 5376023, at *8–9 (holding the plaintiff spoke as an employee and contrasting to precedent, noting "[t]his is not a case in which a public employee learned of misconduct related to her job and testified about the misconduct in court, or reported the misconduct to the press, or participated in an outside investigation into the misconduct" (cleaned up)).

defines her duties. By asserting that her job duties include, *inter alia*, processing applicants for employment and attending meetings specifically for that purpose, developing training for new hires, and leading orientation for eligible candidates who have not yet been hired—but not procuring new hires—Brown paints her job duties with too fine of a brush. *See Poleon v. Virgin Islands*, Civil Action No. 2013-024, 2018 WL 3764086, at *10 (D.V.I. Aug. 8, 2018) ("The scope of [the plaintiff's] employment is based on a practical consideration of what his job actually entails, rather than a narrow delineation of enumerated official versus unofficial duties.").

*De Ritis v. McGarrigle* is instructive. There, the plaintiff, an assistant public defender, attempted to explain why he was supposedly demoted by "circulat[ing] a rumor" to judges and attorneys that "he was being punished by taking too many cases to trial." 861 F.3d at 449. The plaintiff claimed that he engaged in citizen speech when making those statements, highlighting the fact that he did not speak "on the record"; rather, the statements were made "during the usual idle chatter while waiting for court to begin" and not part of his substantive representation. *Id.* at 450. The Third Circuit was unpersuaded by the plaintiff's contention, noting that citizens "do not make idle chatter with attorneys and judges while waiting for court to begin and end as a public defender representing a client may do." *Id.* at 454. The Third Circuit explained that the plaintiff's "ordinary job duties included in-court obligations to build rapport with the Court and other attorneys," and therefore, the plaintiff's statements to the court and other attorneys "were part and parcel of his ordinary job duties—not citizen speech." *Id.* at 453–54. In making its determination that "such chatter" was not "citizen speech," the Third Circuit also emphasized the fact that the plaintiff "had the opportunity to speak to attorneys and judges only as an ordinary corollary to his position as an Assistant Public Defender." *Id.* at 454; *see also Barnes*, 2016 WL

5376023, at *8 ("[The plaintiff] was not present at that meeting because she is a County citizen—she was present because she was a member of the cabinet as the Director of Human Resources. In fact . . . she referred to the meeting as a 'staff meeting.' Thus, even viewing all the facts in the light most favorable to [the plaintiff], she made her statements at the cabinet meeting pursuant to her official duties as Director of Human Resources.").

Just as the *De Ritis* plaintiff unsuccessfully attempted to distinguish between "idle chatter" in court and his ordinary job duties as a public defender, Brown seeks to manufacture a distinction without a difference by crafting a narrow picture of her work. Brown's ordinary job duties included processing applicants, developing training for new hires, tracking employees' training, and leading orientations for those eligible to be hired; attending meetings related to these things is intrinsic to her job description. Just as citizens do not normally make "idle chatter" with judges and attorneys in court, *see De Ritis*, 861 F.3d at 454, citizens also do not normally attend Sheriff's Office meetings related to processing applicants, as a deputy or Sergeant in the background unit might do. There is no evidence in the record that those meetings were open to the public. Ultimately, Brown had the opportunity to attend those meetings "only as an ordinary corollary" to her position as Sergeant in the background investigation unit.

The Fifth Circuit's decision in *Williams v. Dallas Independent School District*, 480 F.3d 689 (5th Cir. 2007) lends persuasive authority for our conclusion. In that case, the plaintiff was the Athletic Director and Head Football Coach of a school district in Dallas. *Id.* at 690. On several occasions, the plaintiff requested that the school's office manager provide him with information about the funds appropriated for athletic activities. *Id.* The plaintiff wrote a memorandum to the office manager, in which he objected to the manager's failure to provide him with that information and the athletic account's balance. *Id.* The plaintiff also sent a

memorandum to the school principal, in which he expressed concern about the handling of school athletic funds. *Id.* The plaintiff argued that in writing the memoranda, he spoke "as a taxpayer" and a "father," not an employee. *Id.* at 692. And the district conceded that "an athletic director is not required to write memoranda to his principal regarding athletic accounts." *Id.* at 693. This was of no moment to the Fifth Circuit.

The court held that the plaintiff did not speak as a citizen. The court recognized that it had to consider "the role [the plaintiff] occupied when he [wrote the memoranda]," *id.* at 692, and reasoned, "Simply because [the plaintiff] wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job," *id.* at 694. In its analysis, the court distinguished from the seminal decision, *Pickering v. Board of Education*, 391 U.S. 563 (1968), where the Supreme Court held that a teacher spoke as a citizen when he sent a letter to the local newspaper criticizing how the school board had handled past proposals on raising revenue for the schools:

> Unlike Pickering, whose position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer, Williams had special knowledge that $200 was raised at a basketball tournament. He was also experienced with standard operating procedures for athletic departments. Even his language accusing the principal of engaging in a 'network of friends and house rules' was part-and-parcel of his concerns about the program he ran.

*Id.* at 694 (cleaned up).

 Likewise, just because Brown did not usually procure new recruits or opine on marketing proposals does not mean that she was not acting within the course of her job duties when she spoke out against the bus wraps. To the extent Brown claims that she opposed the bus wrap proposal in her role as a taxpayer, this Court disagrees. At the meetings, Brown said she opposed the bus wraps because there was no need to advertise for open positions, given that there was an eligibility list in place at the time. (Brown Dep. I at 188:24–189:8.) Like the

*Williams* plaintiff, Brown relied on "special knowledge" derived from her position while speaking. An average citizen would not know that there was no need to recruit new candidates for open DSO positions because there was already an open eligibility list and the Sheriff could have picked candidates from that pool. Unlike the average citizen, Brown had experience with the Sheriff's Office hiring procedures, namely the fact that when open positions arise, individuals are picked from the eligibility list, in the order of their rank based on their exam score. In fact, given Brown's job responsibilities, it seems like she would be in the best position to know—and provide guidance to others in the room—whether there was a need to perform the suggested task. (*See id.* (stating that she believed the bus wraps proposal was "ridiculous" because "*there was not a need to do that for the purposes of processing applicants*" (emphasis added).)

Other considerations also guide our decision. For example, Brown's audience was comprised of other Sheriff's Office employees, individuals she only had access to because of her role within the training and background investigations units of that office. Moreover, the meetings were not open to the public and Brown opposed the bus wrap proposal in response to a subject that one of those other employees raised; thus, her speech "did not have a relevant analogue to speech by citizens who are not government employees." *See Morris*, 487 F. App'x at 40 (holding that the plaintiff did not speak as a citizen when he reported to his superiors an embezzlement issue that he discovered in the course of carrying out of his employment duties, because his speech did not have a "relevant analogue to speech by citizens who are not government employees"); *Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Ed.*, 880 F.3d 643, 652–53 (3d Cir. 2018) (concluding that the plaintiff did not speak as a citizen when she attended a committee meeting in her role as Director of Budget and Financial Planning of the

university, because she attended the meeting "at the behest" of her supervisor, recommended an alternate budget "directly in response to a question from one of the committee members," and there was no evidence "that the meeting was open to the public").

Taken together, even viewing the facts in the light most favorable to Brown, the Court cannot find that Brown engaged in citizen speech when she spoke out against the bus wraps. As such, she cannot establish a free speech retaliation claim based on those statements.

Second, the undisputed facts clearly illustrate that Brown spoke as an employee—not as a citizen—when she opposed processing Savage, Hill, and Serrano for employment. As Sergeant of the background and training units, Brown was responsible for processing applicants for the purpose of employment as DSOs. (*See, e.g.*, Brown Dep. II at 414:3–20 ("When it came to the whole background process with the candidates, it was continuous times being asked to process applicants that weren't a part of the process or people that had some sort of affiliation . . . and me knowing that in order for anyone to process they would have to go through the civil service requirements . . . So that's questioning, you know, *my work as it relates to background because that's a part of what I was responsible for processing applicants*." (emphasis added)). Indeed, Brown repeatedly testified that Williams and Washington approached her about processing Savage, Hill, and Serrano because of her job responsibilities. (*See* Brown Dep. I at 139:14–18 ("Q: Why did Paris Washington come to you to process Lynwood Savage? A: I was the background investigator. I process applicants for purposes of employment."); *id.* at 164:1–5 ("Q: Why did they come to you [about processing Eric Hill]? A: Once I was assigned to the background investigations unit I processed applicants for purposes of deputy sheriff officer employment."); *see also id.* at 172:8–12 ("Q: Why would [Ben Hayllar] come to you about [Wanda Serrano's] agility requirement? A: I was assigned to the background investigation unit.

So I was responsible for processing applicants.").  Thus, Brown did not speak as a citizen when she refused to process certain candidates.

Last, even assuming Brown's refusal to attend the event honoring women is expressive conduct, Defendants' argument that Brown engaged in employee speech when she refused to attend the event (Doc. No. 36 at p. 20) is conclusory and without merit.  Defendants fail to cite any record evidence indicating that Brown's job duties included attending events—whether political in nature or not.  (*See id.*)  Although Brown testified that she attended promotional ceremonies (*see, e.g.*, Brown Dep. I at 104:23–105:10, 106:5–14), there is nothing in the record suggesting that the event honoring women which Brown refused to attend was an event that someone in Brown's position would normally receive an invitation to.  Accordingly, the Court concludes that Brown engaged in citizen speech when she refused to attend the event honoring women.

### b. Brown Has Not Shown that Her Statement Implicated a Matter of Public Concern When She Refused to Attend an Event Honoring Women

When Brown told Washington and Lamb that she would not attend the event honoring women, she spoke as a citizen.  As such, this Court must now address whether her refusal to attend the event involved a matter of public concern.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Hill*, 455 F.3d at 242 (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)); *Gorum*, 561 F.3d at 187 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).  "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241.  "On

the other hand, merely personal grievances do not constitute speech of public concern. Such cases essentially amount to little more than employee complaints or resentments, and they are not the province of a constitutional action." *DeGroat v. DeFabo*, 87 F. Supp. 3d 706, 719 (M.D. Pa. 2015).

Because courts "are not to make superficial characterization of the speech or activity taken as a whole," they must "conduct a particularized examination [of the activities] for which the protection of the First Amendment is complained to determine whether it involves a matter of public concern, while taking care not to cherry pick something that may impact the public while ignoring its manner and context." *De Ritis*, 861 F.3d at 455 (cleaned up); *see also Falco v. Zimmer*, 767 F. App'x 288, 302 (3d Cir. 2019). In this vein, courts have held speech involves a matter of public concern "if it discusses fundamental problems reaching beyond the employee's day-to-day minutiae, such as a concern that all assistant district attorneys in an office are required to work on political campaigns." *De Ritis*, 861 F.3d at 455 (citations omitted). However, if the speech "addresses only the employee's own problems," the speech is "merely a personal grievance"; this is so even if "those problems brush against a matter of public concern by virtue of that employee's public employment." *Id.* (cleaned up); *see also Falco*, 767 F. App'x at 302–03.

At first blush, the question before us appears to be whether refusing to attend a campaign event involved a matter of public concern, given that said speech involves an elected official's demand that a public employee (who is not a political appointee) attend an allegedly political event. *See Connick v. Myers*, 461 U.S. 138, 149 (1983) (holding that the plaintiff's questionnaire, which she circulated at work, "touch[ed] upon a matter of concern" when it asked "if assistant district attorneys ever feel pressured to work in political campaigns on behalf of

office supported candidates" and noting that "official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights" and that "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service").

However, taking the evidence in the light most favorable to Brown, the Court cannot even cross the initial threshold of finding that the event at issue was a campaign or political event. Although Brown believed that the event was for Williams's campaign and "was a mechanism of which to garner favor with women prior to the election" (Brown Dep. I at 205:22–206:5), she has provided no evidence of this, other than her own subjective (and unsupported) belief. The record does not reflect that anyone ever told Brown that it was a campaign or political event or provided her with information to that effect. (*See id.* at 203:2–209:1.) And when pressed on how she knew it was a campaign event, Brown merely responded that it was "obvious" because it "was prior to the election." (*Id.* at 206:6–24.)

It is hornbook law that a non-moving party must set forth more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252; *see also Hayes v. Silvers, Lansam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 65 (E.D. Pa. 2020) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to create an issue of fact and defeat summary judgment."). Brown has failed to do so here.

In addition, Brown has not demonstrated that her speech is more than a personal grievance. *See Falco*, 767 F. App'x at 303 ("Ours and the Supreme Court's jurisprudence is replete with cases concerning criticism of public employers by public employees. Collectively, these cases indicate that speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." (quotation marks and citations omitted)).

In *De Ritis*, the Third Circuit found that the plaintiff's out-of-court statements to other attorneys did not involve a matter of public concern because "[t]he undisputed evidence in the record establishe[d] that [those statements] addressed only [the plaintiff's] own employment situation: '*I'm* being punished.' 'Apparently, *I'm* taking too many cases to trial. 'Judge Kenney thinks *I'm* telling too many defendants they can have trials.'" 861 F.3d at 455. In examining those statements, the Third Circuit observed that the plaintiff "never discussed any fundamental problems reaching beyond his own day-to-day minutiae, such as, for example" the contention that his clients' constitutional rights were being violated (an issue he raised later, in other speech). *Id.* at 456 (cleaned up); *see also Thomas v. Del. State Univ.*, 626 F. App'x 384, 388–89 (3d Cir. 2015) (holding that the plaintiff's grievances about "working conditions and other issues in union members' employment" did not involve a matter of public concern because the plaintiff "offer[ed] nothing that would transform those personnel matters into issues of interest to the broader community"); *cf. De Ritis*, 861 F.3d at 456 (holding that the public defender's speech addressed a matter of public concern when "he suggested that the reason he believed he was being transferred, i.e., his penchant for taking too many cases to trial, violated the rights of his clients to the point of having constitutional implications," because such speech "expressed concern for individuals other than himself" and was not "confine[d]" "to his own employment situation").

The same analysis applies with equal force here. Brown testified that when she spoke to Washington, she told him: "*I* was not attending because *I* was not going to be utilized as a tool for the purposes of . . . Jewell Williams' political agenda because *I* knew exactly why he was having the event. And it was to garner favor with women politically. And *I* was not going to be used as a vehicle for that." (Brown Dep. II at 374:3–16 (emphasis added).) Like *De Ritis*, the

undisputed evidence before us establishes that Brown's statements addressed only her own employment situation. In other words, as with the *De Ritis* plaintiff's out-of-court statements, Brown "never discussed any fundamental problems reaching beyond [her] own day-to-day minutiae."

Because the Court holds that Brown's refusal to attend an event honoring women (that actually never took place) did not involve a matter of public concern, and because, as discussed above, the Court holds that Brown's opposition to processing certain candidates and the bus wraps did not constitute citizen speech, the Court concludes that Brown did not engage in any protected speech. Accordingly, Defendants' summary judgment motion will be granted on Brown's free speech retaliation claim.

### 2. *Political Patronage Retaliation*

The Court now turns to Brown's political retaliation claim. To state a *prima facie* case of discrimination based on political patronage in violation of the First Amendment, a plaintiff must establish that "(1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007) (citation omitted); *see also Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 663–64 (3d Cir. 2002). "Implicit in the final prong 'is a requirement that the plaintiff produce sufficient evidence to show that the defendant knew of the plaintiff's political persuasion, which requires proof of both knowledge and causation.'" *Galli*, 490 F.3d at 275 (cleaned up); *see also Best v. Hous. Auth.*, 61 F. Supp. 3d 465, 472 (D.N.J. 2014); *Stuby v. Bedford County*, Civil Action No. 3:12-47, 2013 WL 5724065, at *3 (W.D. Pa. Oct. 21, 2013). If the plaintiff establishes all three elements, the burden then

shifts to the government to prove "by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Galli*, 490 U.S. at 271 (citations omitted); *Goodman*, 293 F.3d at 664.

Here, Brown claims that she was retaliated against for not supporting Sheriff Williams for re-election and not being in political alignment with his administration. To be sure, "[t]he right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing party or candidate." *Galli*, 490 F.3d at 272. In this Circuit, courts have found employees to engage in constitutionally protected conduct where they actively supported "a losing candidate within the same political party," where they "fail[ed] to support the winning candidate," and where they "fail[ed] to engage in any political activity whatsoever." *Galli*, 490 F.3d at 272–73; *see also Gulick v. City of Pittston*, 995 F. Supp. 2d 322, 333–35 (M.D. Pa. 2014). In short, a citizen and public employee's "right not to support a candidate is just as relevant for First Amendment purposes as her right to support one." *Galli*, 490 F.3d at 273; *see also id.* at 274 ("Galli has presented some evidence that she did not politically support the Democratic Party or Governor McGreevey. Whether her failure to support is evidenced by a decision to support a competing candidate or party, or by a decision to be apolitical and support no candidate or party, it is constitutionally protected.").

First, it is undisputed that Brown's position did not require any political affiliation. (Hr'g Tr. at 23:9–16.) *See Stuby*, 2013 WL 5724065, at *5 ("At the time of their dismissal, Plaintiff worked as deputy sheriffs with the Bedford County Sheriff's Office, a position with a public agency that does not require a political affiliation.").

Brown asserts that she engaged in constitutionally protected activity when she opposed

processing Savage, Hill, and Serrano for employment and when she refused to attend the event honoring women.  Defendants assert that Brown cannot show that she engaged in constitutionally protected activity and thereby satisfy the second prong of the *political patronage test* because those activities did not constitute protected speech under the *free speech retaliation test*.  (*See* Hr'g Tr. at 23:18–24 (when discussing the political patronage claim, stating that Brown's case "falls apart" at the second prong—when she has to show that "she was engaged in constitutionally protected conduct"—and that "we go back to same analysis to determine what's protected speech" in the free speech retaliation claim and then discussing whether she spoke as an employee versus citizen and or about a matter of public concern).)

Although there is obvious overlap between Brown's free speech and political retaliation claims, Defendants conflate the free speech retaliation and political patronage retaliation tests (in particular, the protected activity prongs), but cite no support for doing so.  And here, there is at least some evidence that Brown engaged in constitutionally protected conduct when she declined to attend the event honoring women and in doing so, made clear that she wanted to remain apolitical.  (*See* Brown Dep. II at 374:3–16 (Brown's testimony that she told Washington that "[she] was not going to be utilized as a tool for the purposes of . . . Jewell Williams' political agenda because [she] knew exactly why he was having the event.  And it was to garner favor with women politically").)  *See, e.g.*, *Gulick*, 995 F. Supp. 2d at 334 (finding the plaintiff had presented at least some evidence that he engaged in constitutionally protected activity, as he testified in his deposition that he supported a mayor in his bid for re-election); *see also Morin v. Tormey*, 626 F.3d 40, 44 (2d Cir. 2010) ("Plaintiff expressed no political opinion; she simply asserted her right not to be pressed into political activity.  The right to be free from retaliation based on political affiliation is not limited to members of an opposing political party, but extends

to those who are perceived by those retaliating to be apolitical or insufficiently politically loyal.").

Next, Brown argues that her protected activity was a substantial factor in Defendants' decision to not assign her to an investigation, not invite her to events, take away her work vehicle, fail to promote her, exclude her from overtime opportunities, and reduce her supervisory authority. Brown must "produce evidence tending to show that" Defendants knew she did not support Sheriff Williams's administration or his run for re-election and that she was penalized as a result. *See id.* at 275. As the Third Circuit has made clear, "this inquiry does not depend on whether [Brown] made her political views known to the [decision-maker]; rather, it is whether [the decision-maker] was aware that Brown failed to show public support for [Sheriff Williams and his administration]." *Id.*

Here, Brown has provided at least some evidence that Paris Washington was aware that she did not support Sheriff Williams's re-election campaign and intended to remain apolitical. According to Brown, when she declined to attend the event honoring women, which she construed to be a campaign event, she told Washington that "[she] was not going to be utilized as a tool for the purposes of . . . Jewell Williams' political agenda because [she] knew exactly why he was having the event. And it was to garner favor with women politically. And [she] was not going to [b]e used as a vehicle for that." (Brown Dep. II at 374:3–16.)

It is much less clear whether *Sheriff Williams* was aware that she did not support his campaign. Indeed, Brown's own testimony indicates that she had no firsthand knowledge that Sheriff Williams was aware she was remaining apolitical and did not support him. (*See, e.g.*, *id.* at 370:18–24 ("Q: Do you have any personal knowledge that any of the people who attended that first [bus wrap] meeting communicated to Jewell Williams afterwards that you were opposed to

the bus wraps?  A: *I don't have firsthand knowledge*, but I do know that Harriet Lessy was at the meeting . . . [and] [s]he was solely there to communicate anything that happened directly to the sheriff because she reported to him." (emphasis added)); *id.* at 371:15–19 ("Q: Did you ever communicate to Jewell Williams that you were opposed to the bus wraps?  A: *I did not directly say that to Jewell Williams*, but I did say that at the meeting." (emphasis added)); *id.* at 376:16–377:2 ("Q: Were you ever present in any meeting where Paris Washington told Jewell Williams that you weren't going to attend the event for women?  A: I don't recall saying that.  And once again, I said it to Paris Washington.  I don't recall that—Jewell Williams being present when that actually was said.").)

Rather, Brown relies solely on her (un-supported) belief that Lessy and Washington must have communicated her political affiliation and/or position to Williams.  (*See, e.g.*, *id.* at 370:18–24; *id.* at 374:17–375:4 ("Q: Did you ever tell Jewell Williams that you weren't going to attend the event for women?  A: I don't specifically recall saying that to him, but I know that it was communicated to him that I was not attending the event.  Q: How do you know that it was communicated to [him] that you were not going to – A: Because once again he had a relationship with Paris Washington."); *id.* at 376:16–377:2).)  The affidavits Brown offers from other (former and current) Sheriff's Office employees are not much better and largely consist of conclusory assertions, which this Court need not accept.  (*See, e.g.*, Doc. No. 41, Ex. 6 ("Richard Verrechio Aff.") at pp. 129–131 ¶ 10 ("Sheriff Williams viewed Plaintiff as being insufficiently politically loyal."); Doc. No. 41, Ex. 4 ("Monte Guess Aff.") at pp. 122–24 ("Sheriff Williams viewed Plaintiff as being insufficiently politically loyal."); *see also* Doc. No. 41, Ex. 2 ("Devon Floyd Aff.") at pp. 17–19 ¶¶ 7–8 ("At these meetings, Plaintiff complained that she believed these bus wraps were really campaign re-election advertisements for Sheriff Williams and not solicitations

for new recruits. Thereafter, Sheriff Williams transferred Plaintiff's vehicle (a car with lights and sirens) to Lynwood Savage (a civilian). I can think of no legitimate, non-retaliatory explanation for this act.").)

However, viewing the evidence in the light most favorable to Brown—as we must at this stage—Brown has provided at least some evidence that permits the inference that Williams did not perceive her to be a supporter of his administration. (*See* Guess Aff. at ¶ 12 ("In May 2019, I overheard Sheriff Williams blaming Plaintiff and others for his political defeat, complaining that no one 'stuck up for him in the press' and that they (Plaintiff and others) were going to 'pay for this.'"); Verrecchio Aff. at ¶ 9 (same); *see* Brown Dep. II at 391:4–22 ("Q: Did Jewell Williams ever tell you that he blamed you for not winning? A: He said to me that we would pay. And I was there when he said that for him not winning, yes . . . Q: Who else did you understand Jewell Williams to be referring to when he said we would pay? Who's the we that he was — A: Anyone that was not in favor of him he blamed me for the election — for him not winning the election I should say.").)[30] *See Galli*, 490 F.3d at 275 ("Galli's deposition testimony indicates that, following her termination, Commissioner Nissley allegedly stated that the Commission was 'letting Republicans go,' that 'some Democrat obviously wants the spot,' and that one has to 'pay to play with this administration.' These statements permit an inference that the Commission did not perceive Galli to be a supporter of McGreevey's administration or affiliated with the Democratic Party.").

---

[30] Parsons's deposition testimony sheds some doubt on these statements and whether they were directed at Plaintiff and/or showed that Williams was aware Brown did not support him. Although Parsons submitted in his affidavit that he heard Williams say he was going to "get" Brown (Parsons Aff. at ¶ 15), he walked back from these statements in his deposition. Specifically, Parsons testified that "[Williams] said he would get people — get back at people . . . because of the election" but "didn't hear him say [Brown's] name in particular." (Parsons Dep. at 46:21–47:10.)

Next, the Court considers whether Brown has established a causal connection between her political affiliation and actions taken against her. Brown claims she suffered from a litany of alleged adverse actions, including increased supervisory authority over her, reduction of her supervisory duties, and the removal of her work vehicle privileges. However, Plaintiff does not explain how some of these actions transcend "the bounds of customary workplace supervision." *See Best*, 61 F. Supp. 3d at 473 (concluding that the plaintiff "fail[ed] to explain, beyond conclusory allegations, how . . . ordinary changes in his employment related in any way to his political affiliation," including the requirement that plaintiff "clock in and out" of his office, the reduction of the plaintiff's supervisory duties, and the prohibition on the use of the van, which the court found were "well within the bounds of customary workplace supervision"). In addition, Brown has not shown that Sheriff Williams was involved in some of these decisions, such as the decision not to give Brown overtime with respect to the PFA orders. (*See* Brown Dep. II at 378:17–22 ("Q: Do you have any firsthand personal knowledge of Jewell Williams instructing anyone at the Sheriff's Office not to assign you overtime? A: I do not have independent knowledge of him specifically, but once again, I know that there were orders that were made through Paris as it related to the sheriff because Paris worked directly for the sheriff and reported to him.").) *See Best*, 61. F. Supp. 3d at 473 ("Even if the court accepted these statements as true, they would not establish a causal connection between his political affiliation and his layoff. Plaintiff has presented no evidence showing that members of the City Council or the ACHA board were involved in the decision to terminate his position.").

Nonetheless, construing all facts and the inferences that follow in the light most favorable to Brown, the Court reluctantly finds that Brown has set forth a genuine dispute of material fact as to causation. In particular, there is a question as to whether Brown was treated differently

from other similarly situated employees. On one hand, Brown argues that promoting the seventh and eighth candidates on the eligibility list (Bozarth and Moore) to Lieutenant ahead of her, when she ranked sixth on the list, was retaliatory, as was reassigning her work vehicle. As Defendants correctly point out (*see* Defs.' Statement of Facts ¶ 32), another candidate who ranked number three—and therefore was even higher on the eligibility list than Brown—was also passed over for promotion at the same time. (Brown Dep. I at 244:3–246:4.) And Brown does not present any evidence, or even make any allegations, regarding Bozarth and Moore's political affiliation and whether they supported Williams. Further, nowhere does Brown provide evidence showing that Sergeants are entitled to a work vehicle by virtue of their position or that she was the only one who had her work vehicle reassigned and was targeted in that regard.

But the Court is constrained, at this stage, and will allow the political patronage claim to survive summary judgment, as Brown has provided at least some evidence indicating that she and other employees who were perceived as disloyal to Sheriff Williams were treated differently (*see, e.g.*, Guess Aff. at ¶¶ 10, 14 ("After I had filed my complaint, I had my office ransacked numerous times; I was surveilled; and excluded from numerous activities that I had previously attended . . . I am aware that after Sheriff Williams lost his primary election, Plaintiff . . . like me: was excluded from meetings, promotions, swearing-in ceremonies, and luncheons."); Parsons Aff. at ¶ 18 ("There are many commonalities as to what Plaintiff experienced at the hands of Sheriff Williams as to what I had experienced: after I had engaged in protected activity, Sheriff Williams or his assignee transferred me; removed me from investigations; passed over me for promotion; and officers broke into my house."), and that she was treated differently from others similarly situated (*see, e.g.*, Parsons Aff. at ¶ 127 ("I am aware that Lynwood Savage, Paris Washington, two of Sheriff Williams' drivers, and the Warrant Unit were given all of the

overtime for serving PFAs and Plaintiff was excluded from this activity); Floyd Aff. at ¶ 10 ("Being in HR, I was aware of the overtime allocation during 2019 and I believe Lynwood Savage's overtime may have been close to three times that of Plaintiff's.")).  There may certainly be credibility issues as to these affidavits, given the affiants' own pending and settled lawsuits against Defendants, and as to Plaintiff's own self-serving testimony, but the Court is not permitted to resolve such credibility issues at this time.  *Anderson*, 477 U.S. at 255.

## III.    Conclusion

For the foregoing reasons, the Court dismisses the official capacity claims against Sheriff Williams and the free speech retaliation claim against both Defendants.  However, the Court denies Defendants' motion for summary judgment as to the political patronage claim.[31]

An appropriate order follows.

---

[31] The Court also denies Defendants' motion for summary judgment as to the *Monell* claim.  Defendants' argument that the *Monell* claim must be dismissed hinges on their contention that Brown has not stated a constitutional injury.  (*See* Doc. No. 36 at pp. 26–29.)  Because the Court denies summary judgment as to the political patronage retaliation claim, Defendants' argument that there is no underlying constitutional violation fails at this point.